IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON COOPER, administrator of the Estate of Teresa Iacovetti, deceased, | )<br>)<br>) |
| Petitioner, | ) Case No. 09 C 3452<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| CITY OF CHICAGO HEIGHTS, et al. | )<br>) |
| Respondents. | ) |

**MEMORANDUM OPINION AND ORDER**

Teresa Iacovetti's ex-boyfriend Allen Perkins allegedly murdered her after she repeatedly complained about Perkins' harrassment to the City of Chicago Heights ("the City") police department and Perkins' parole officer, Agent Bradley (together "Defendants"). Jason Cooper, as administrator of Iacovetti's estate, sued the City and Bradley, asserting that Defendants violated the equal protection clause because they gave inferior protective services to Iacovetti because she was a woman. The parties now move to bar certain testimony of each other's expert witnesses (*see* Docs. 170, 171 and 173), asserting the experts are either unqualified to give particular opinions or reached those opinions using faulty methodologies. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). For the below reasons, the Court grants the motions in part and denies them in part.

**I.  BACKGROUND**

**A.  Plaintiff's Allegations and Equal Protection Claim**

Cooper alleges that Iacovetti, a resident of the City, entered into a romantic relationship with Perkins, an Illinois Department of Corrections parolee, in 2006. After the relationship ended, Perkins harassed and abused Iacovetti. Iacovetti repeatedly complained to the City's police

department ("CHPD") about that abuse. In November 2006, Iacovetti called 911 and told the operator that Perkins was yelling that he was going to shoot her. According to Cooper, City police officers offered Iacovetti advice on how to file a complaint but did not arrest Perkins.

On May 7, 2007, after several incidents of abuse and harassment that Iacovetti reported to the CHPD, Cooper alleges Iacovetti obtained an emergency protective order against Perkins instructing that he have no contact with Iacovetti, including phone calls, in-person visits, and third party contact. When Perkins violated this order of protection in May 2011, Iacovetti advised Bradley of Perkins's persistent abuse and harassment, but Perkins' parole was not revoked. On June 21, 2007, Perkins came to Iacovetti's home, struck her, and then shot her in the head. She later died.

As the Court has noted previously in this case (*see* Doc. 49), Cooper has not alleged a due process violation because "[g]enerally, there is no constitutional right, either in the due process clause or the equal protection clause, to be protected against being attacked . . . by a member of the general public." *Lowers v. City of Streator*, 627 F. Supp. 244, 246 (N.D. Ill. 1985); *Sandage v. Bd. of Com'rs*, 548 F.3d 595, 596 (7th Cir. 2008) ("there is no constitutional right to be protected by the state against being murdered by criminals or madmen.") However, Defendants would be liable under the equal protection clause via 42 U.S.C. § 1983 if Defendants "selectively denied [their] protective services to certain disfavored minorities." *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1987). Specifically, Cooper's complaint alleges that Defendants engaged in a policy, pattern and practice of treating domestic abuse reports from women with less priority than other crimes, and Iacovetti suffered and died as a result.

**B.    The Proposed Experts and Daubert Challenges.**

Cooper offers two experts, one corresponding roughly to each element he must prove. First,

Cooper offers William Allee, a purported police practice and policy expert, to opine that the CHPD and Bradley gave Iacovetti inferior police services. Allee spent 40 years with the New York City police department ("NYPD"), steadily moving up its ranks until he retired as Chief of Detectives—the supervisor of all 5,000 NYPD detectives—in 2003. During his time with the NYPD, he supervised officers in a wide variety of units and had various special assignments to high-crime areas of New York City. Allee's ultimate conclusions are:

- Iacovetti's murder would have been prevented if the CHPD had followed its own protocol;

- Bradley "did not do his job and take action" on Perkins' parole violations, which allowed Perkins to murder Iacovetti.

(*See* Doc. 177-3.) According to the City, the jury should not hear portions of Attlee's testimony because:

- his opinions concerning the steps the CHPD should have taken to further investigate Iacovetti's complaints are irrelevant;

- he cites nothing supporting his opinion that the City's domestic violence unit should not have been disbanded;

- his opinions do not consider Illinois criminal law, the division of labor in the CHPD or the CHPD's role with respect to the role of the prosecutor's office;

- he is not familiar with police practices in Illinois; and

- the jury does not need expert evidence to conclude the CHPD's failures "to connect the incidents with [sic] Perkin, attempt to revoke his parole, or conduct further investigation, led to a failure to prevent crime."

(City Memo., Doc. 171, at 6-9.) Bradley claims Allee is not qualified to testify concerning Bradley's conduct because Allee's experience does not relate to parole or mandatory release. (Bradley Memo., Doc. 173, at 5.) Bradley also asserts that Allee cannot suggest that Bradley owed

3

Iacovetti a duty to protect her, or opine as to Bradley's state of mind. (*Id*. at 6-9.)

Cooper's second expert is Dr. Kathleen Ferraro, a sociologist and professor at Northern Arizona University, who proposes to opine that Iacovetti received less protection from the CHPD and Bradley because she was female. Dr. Ferraro has written extensively on domestic violence, crime against women, and the criminal justice system. She reaches following specific conclusions:

- The CHPD and Bradley were aware of Iacovetti's risk of "intimate partner homicide" and Defendants had a "special relationship" with Iacovetti;

- Based on the CHPD's protocol, the CHPD should have provided assistance to Iacovetti and taken "appropriate action against" Perkins;

- the CHPD's failure to follow its protocol "constitutes willful and wanton misconduct;"

- The CHPD and Agent Bradley failed to protect Iacovetti based on her race, gender and relationship status, and Iacovetti "would have received a different response if she was a wealthy, white woman who was not a former girlfriend of Perkins."

(*See* Doc. 177-6.) The City assert that Dr. Ferraro's testimony should be barred because:

- the studies she relies upon regarding police responses to domestic violence cannot be applied to this case because those studies did not compare women to men, and Dr. Ferraro did not examine any data from the City;

- Dr. Ferraro conceded that any discrimination against Iacovetti was based first and foremost race, not gender;

- She cannot opine that Iacovetti had a "special relationship" with the CHPD because it is a legal conclusion;

- Dr. Ferraro is not qualified to opine as to how police should have handled Iacovetti's situation with Perkins; and

- The jury does not need expert testimony to conclude that "domestic violence is more likely to affect women, that women who are minorities and residing in a poverty stricken area are more likely to suffer an escalation of domestic violence and ineffective police response, and that women that are threatened

4

with weapons . . . are more likely to be more seriously injured."
(City Memo. at 8-11.) In addition to some of the grounds identified by the City, Bradley also asserts that Dr. Ferraro is not qualified to opine regarding Bradley's duties and responsibilities or whether he should have revoked Perkins' parole, and cannot suggest that Bradley had a duty to protect Iacovetti. (Bradley Memo. at 10-11.) Finally, Bradley also takes issue with Dr. Ferraro's conclusion that the police would have had a different response had Iacovetti been a "wealthy white woman" not previously involved with Perkins, asserting it is speculation and conclusory. (*Id.* at 12-13.)

Cooper, in turn, challenges Robert Johnson, the City's police policy and practices expert. Johnson was, before he retired, a lieutenant colonel in the Illinois State Police. Cooper does not challenge Johnson's qualifications, only his methodology. Johnson reaches three opinions:

- The CHPD's services were "reasonable and in accordance with accepted practices and standards within the field of law enforcement;"

- The CHPD's response "generally complied with the requirements set forth for [l]aw [e]nforcement in the Illinois Domestic Violence Act and any omissions were not willful and wanton;"

- The CHPD's response "was reasonable and there is no indication that her gender played a part in the level of response or law enforcement services rendered."

(Doc. 170-2.) According to Cooper, Johnson's testimony should be restricted because:

- his conclusion that Iacovetti did not contact the CHPD after May 8, 2007 is not supported by record;

- his opinion that Iacovetti failed to cooperate in prosecuting Perkins and that the CHPD treated Iacovetti "professionally" is based on speculation;

- his suggestion that domestic violence complainants are "frequently" under the influence of drugs or alcohol is inapplicable here because there is no evidence that Iacovetti was impaired at any time;

5

- the jury will not benefit from his "common sense" observations regarding witness involvement in criminal prosecutions.

(Pl. Memo., Doc. 170, at 4-8.)

## II. STANDARD

Whether expert testimony is admissible is determined by reference to Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The proponent of the expert testimony bears the burden of proof with respect to whether the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Rule 702 assigns the trial judge the "gate-keeping function" of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 492 F.3d at 589, 597. The focus of this decision "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 492 F.3d at 595. The Court applies a three-step analysis for determining the admissibility of expert testimony under Rule 702. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.'" *Id.* (quoting F.R.E. 702.) Second, "the expert's reasoning or methodologies underlying the testimony must be scientifically reliable." *Id.* Third, the expert's testimony must be relevant, that is, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

## III. DISCUSSION

### A. Ferraro

Dr. Ferraro's opinions generally make two connections. First, Dr. Ferraro cites several studies that list the various risk factors, including gender and marital status, that make it more likely

6

that someone will be killed by a former lover. Dr. Ferraro concludes that many of those risk factors applied to Iacovetti and, given the their policies, Defendants should have intervened knowing Iacovetti was at risk. Second, Dr. Ferraro cites various studies that support the inference that poor black women like Iacovetti receive less police protection. From those studies, Dr. Ferraro concludes that Iacovetti received inferior police response from Defendants on account of her "race, gender and relationship status."

Despite Defendants' suggestions to the contrary, Dr. Ferraro is qualified to make the first connection. She has studied and written extensively concerning police response to domestic violence and the relationship between victims of domestic violence and the police. (*See* Doc. 177-5.) She also has trained clemency boards concerning domestic violence. (Doc. Ferraro Tr., Doc 177-1, at 68.) How the police should, as a matter of policy, respond to domestic violence complaints and the risk factors for "intimate partner homicide" are a proper subject of expert testimony. *See Ervin*, 492 F.3d at 904 ("expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.") Whether Dr. Ferraro's opinions concerning the CHPD and Bradley's response should be ignored because she has never been a police or parole officer is a matter for cross-examination, not a reason to disqualify an otherwise qualified expert under *Daubert*. Further, given her expertise and methodology of comparing Iacovetti to known risk factors, she is qualified to evaluate Defendants' response to Iacovetti's complaints against the background of the applicable domestic violence response policies and standards. She may then opine that Defendants' actions did not suffice under those policies and standards. As Cooper must show that Iacovetti received an inferior police response to prove his case, there is no doubt this testimony is relevant.

Turning to the second connection, to support the conclusion that Iacovetti received less police

7

protection because of her gender, Dr. Ferraro cites two types of studies. At best, the first set suggests that perpetrators of domestic violence are less likely to be arrested than perpetrators of "stranger violence" and suggest a number of factors explaining the disparity. The second set of studies suggest that suggest that black women call the police to report "intimate partner violence" at a higher rate than women of other races, but that calls from black women result in fewer arrests. Dr. Ferraro extrapolates from these studies to conclude that the CHPD, in this case, gave Iacovetti less protection. That conclusion is inadmissible under *Daubert* for several reasons. First, the studies' conclusions are irrelevant because they do not fit the allegations made in this case. *See Ervin*, 492 F.3d at 904 (requiring that the expert's testimony assist the jury in deciding the issues in the case). Dr. Ferraro's discussion of the studies does not indicate that the studies compared how women are treated by the police as compared to men, or suggest that police more vigorously investigate domestic violence cases when the victims is male rather than female. At best, these studies suggest that certain *types* of women (poor and African-American) are treated worse than rich, white women, or that people that know their attackers receive less protection from police. (*See* Doc. 178-5, at 10 (citing a study that found "that police are less likely to arrest male domestic abusers than male stranger assailants.").) But this case concerns gender discrimination, not discrimination based on race, wealth or relationship with the purported assailant. Further, to the extent that Dr. Ferraro's point is that women are more likely to be victims of domestic violence than men, that is common knowledge and the jury does not need the assistance of an expert. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (finding "[a]n expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury.") (internal

8

citation and quotation omitted).[1]

Second, even if the data was directly on point, the only connection between these studies and this specific case is Dr. Ferraro's say-so. Consequently, her conclusion is unreliable under *Daubert*. *See Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (quoting *General Electric Corp. v. Joiner*, 522 U.S. 136, 146 (1997) and finding "[e]xperts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") Put simply, Dr. Ferraro improperly generalizes from national data or data from other cities to make a conclusion about a specific case in one specific city without any methodology to make that connection. She did not analyze any data from the City regarding its arrests in domestic violence cases or see if that data showed that more arrests were made when a man is the victim as opposed to a woman. If Dr. Ferraro is trying to point out that women are more likely to be victims of domestic violence and studies show fewer arrests are made when domestic violence is alleged as opposed to "stranger" violence, she must use *some* methodology that suggests that general proposition is true in the City. Indeed, without any methodology, Dr. Ferraro has no reason to know whether the CHPD was more likely to arrest a woman who abused a her boyfriend, rather than the other way around, or whether the CHPD arrested perpetrators of domestic violence more often than assailants that did not know their victims. Under *Daubert*, Dr. Ferraro cannot opine that

---

[1] In her report, Dr. Ferraro mentions derogatory language—"bitch," "fucking idiot"— used by CHPD personnel to refer to Iacovetti. To the extent that language is the basis for her opinion that the CHPD discriminated against Iacovetti on the basis of her gender, that opinion is barred because the jury could readily make that connection without Dr. Ferraro's help. *See Dhillon*., 269 F.3d at 871. Any general discussion by Johnson suggesting such language is normal police banter is barred for the same reason. When and under what circumstances CHPD personnel use that type of language is a question for lay witnesses and whether an inference of discrimination may be made from that language, in those circumstances, is a question for the jury.

Iacovetti received inferior police protection on account of her gender.

Dr. Ferraro also cannot opine that Defendants' response constituted "willful and wanton misconduct" or that Iacovetti had a "special relationship" with Defendants. Those are impermissible legal conclusions. *See Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 294 (N.D. Ill. 2005) (citing *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) and finding "[i]n the Seventh Circuit, expert witnesses are prohibited from testifying as to legal conclusions.")[2] Even if the term "special relationship" is grounded in sociology, not the law, as Cooper asserts, that term could confuse the jury by suggesting that this case concerns denial of Iacovetti's due process rights or that Defendants had an affirmative and general duty to protect her. *See* F.R.E. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues, or misleading the jury ...."); *Allen v. City of Rockford*, 349 F.3d 1015, 1019 (7th Cir. 2003) (noting a "special relationship" between a state and a citizen is an exception to *DeShaney*'s general rule that the due process clause does not impose an affirmative obligation on the state to protect its citizens).

### B. The Police Practice and Policy Experts

Cooper offers Allee to testify that Iacovetti received inferior police services, and the City offers Johnson to suggest both that the CHPD's response was adequate and that "there is no indication that her gender played a part in the level of response or law enforcement services rendered." First, both Allee and Johnson are former high-ranking police officers with substantial

---

[2] Johnson's conclusion that the CHPD's conduct was not willful and wanton or that it complied with the Illinois Domestic Violence Act is barred for the same reason. *See Klaczak v. Consolidated Med. Trans. Inc.*, No. 96 C 6502, 2005 WL 1564981, at *4 (N.D. Ill. May 26, 2005) (citing *Good Shepard*, 323 F.3d at 564 and noting that in the Seventh Circuit, "an expert may not offer opinion testimony as to whether a defendant violated a statute or regulation, at least where that statute or regulation is at issue in the case.")

experience with police practices and procedures. Both can opine as to whether or not Iacovetti received appropriate police services as compared to the City's policies or standard police practices. *See Ervin*, 492 F.3d at 904. As noted above, that testimony is highly relevant. For the same reasons, Johnson and Allee may opine, based on their experience, as to whether the CHPD's treatment of Iacovetti met police professionalism standards. Further, Allee's experience with allocation of police resources qualifies him to opine that using a federal grant to fund follow-up investigation in domestic violence cases is an appropriate use of police resources. *Id*.[3]

The City's suggestion that Allee is not qualified to opine as to Illinois police practices because he was a NYPD officer, and not an Illinois police officer, is unpersuasive. First, Allee's long experience as a senior police officer allows him to compare the police response Iacovetti received to the response required by the City's policies. Second, to the extent Allee opines that the City's policy is insufficient as compared to standard police practice, the City makes no showing police practices in Illinois are different from the police practices in New York City so as to make Allee's opinion unreliable or irrelevant under *Daubert*. Rather, Allee's purported unfamiliarity with Illinois police practice, the division of labor inside within the CHPD, and the relationship between the CHPD and the prosecutor's office are suggestions that Allee's opinions are wrong and are subjects for cross examination. *See Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003) ("it is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the

---

[3] Though Allee may opine that the CHPD should have used the federal grant for domestic violence follow-up, he cannot opine that "maybe . . . the end results" in the Iacovetti murder "would not have been so tragic" with such a program in place. As Allee highlights by use of the term "maybe," his suggestion has no reliable basis. *See Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004) (finding uniformed speculation is improper under *Daubert*'s principles).

11

methodology underlying that testimony is sound.") The case cited by the City for the proposition that a former NYPD officer cannot testify as to Illinois police practices, *United States v. Hirschberg*, 988 F.2d 1509, 1513 (7th Cir. 1993), is not on point. There, the witness, an Illinois detective, proposed to testify that he had never heard of a detective carrying around his files in his car at all times in order to discredit a Florida detective's testimony. The defense did not qualify the Illinois detective as an expert and the court noted that the testimony was not relevant because he was not from Florida and did not know the Florida detective. The proposed expert testimony in this case does not concern the credibility of a police officer or the filing habits of a particular detective, but rather much broader police practices.

Bradley suggests that Allee, as former police officer, is not qualified to opine regarding what Bradley, a parole officer, should have done. The Court must "consider a proposed expert's full range of practical experience . . . when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Allee has 40 years experience encompassing almost every facet of police work, from investigation to beat policing of high crime areas. Considering that long and broad experience, there is little doubt that Allee has substantial experience with parolees and the parole system. Cooper has established Allee is qualified to testify about whether Bradley's response was insufficient.

Though Johnson may opine regarding the nature of the police response Iacovetti received and why it was sufficient or typical, Johnson cannot opine that "there is no indication" that Iacovetti's gender influenced the police response. That is simply a conclusion as to existence or sufficiency of Cooper's evidence of discrimination against Iacovetti. A bottom line conclusion is impermissible under *Daubert. See United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (finding an expert

12

cannot "merely tell the jury what result to reach.") Put simply, the jury does not need expert testimony to help it decide whether evidence of discrimination exists or not. Indeed, the jury system presupposes that an ordinary person can make that determination.[4] Similarly, Johnson cannot "conclude" that Iacovetti did not contact the CHPD after May 7, 2007. Whether Iacovetti called the CHPD, as a factual matter, does not require expert testimony. On the other hand, how calls are typically documented by police departments and whether the CHPD properly documented Iacovetti's calls are outside the ken of an ordinary person and are proper subjects of expert testimony.

Johnson also concludes that Iacovetti did not cooperate with the prosecution of Perkins after he violated the order of protection based on the prosecutor's motion to strike the case against Perkins with leave to re-instate it (known as an "SOL"). According to Johnson, the SOL was based on Iacovetti's failure to appear at the hearing or because the prosecutor determined she was a poor witness. That conclusion is based on Johnson's experience watching "thousands" of cases in court, not any review of court records in this specific case or discussions with the prosecutors who worked on it. (*See* Johnson Tr., Doc. 170-1, at 108-09.) An expert witness cannot simply speculate because speculation is not based on a reliable methodology. *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004) (under the reliability prong of the *Daubert* test, "a court is expected to reject any subjective belief or speculation") (internal citations omitted). While Johnson may testify as to the common reasons for SOLs based on his experience, he has done nothing to connect that experience with Perkins' case. That lack of methodology is the hallmark of speculation, and Johnson cannot opine that Iacovetti did not cooperate with the prosecution of Perkins based on the SOL disposition

---

[4] For the same reason, the experts cannot opine as to any individual's intent or state of mind. *See Klaczak*, 2005 WL 1564981, at *10 (finding an expert is no more qualified than an average juror to testify as to a defendant's state of mind).

13

of Perkins' case. *Id.*

Finally, Johnson's statement that people that call the police to report domestic violence are frequently under the influence is irrelevant and overly prejudicial. *See Ervin*, 492 F.3d at 904; F.R.E. 403. As Johnson admitted at his deposition, there is no evidence that suggests that Iacovetti was ever under the influence when she contacted the CHPD or Bradley. (Johnson Tr. 137-38.)

**IV.     CONCLUSION**

For the foregoing reasons, the parties' motions (Docs. 170, 171 and 173) are granted in part and denied in part.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Dated: May 27, 2011