IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JASON COOPER, administrator of the Estate of Teresa Iacovetti, deceased, | ) ) ) ) | |
| Petitioner, | ) ) | Case No. 09 C 3452 |
| v. | ) ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO HEIGHTS, *et al.* | ) ) ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION AND ORDER

Teresa Iacovetti's ex-boyfriend Allen Perkins murdered her after she repeatedly complained about Perkins' harassment to the City of Chicago Heights' police department ("CHPD") and Perkins' parole officer, Agent Eric Bradley (together "the Defendants").  Jason Cooper, as administrator of Iacovetti's estate, sued the City and Bradley (in his individual capacity), asserting that Defendants violated the Equal Protection Clause because they failed to protect Iacovetti because she was a woman.  Specifically, Cooper asserts that the Defendants took complaints from domestic violence victims like Iacovetti, who are overwhelmingly female, less seriously than other crimes, and as a result, Perkins stayed out of jail and was able to murder Iacovetti.  The Defendants now move for summary judgment.  Because Cooper has not demonstrated the CHPD has a policy or practice of treating complaints from women or domestic violence victims with less seriousness than complaints from men, and has not shown any evidence that Bradley intended to discriminate against Iacovetti because of her gender, the Court grants summary judgment to the Defendants.

I.      MATERIAL UNDISPUTED FACTS

   A.      Cooper's Motion to Strike

   As an initial matter, Cooper moves to strike a number of the City's Local Rule 56.1 statements because they rely on an affidavit from an undisclosed witness and audiotapes of phone calls recorded by the CHPD that were previously barred because the City produced them too late. Some of the City's facts cite the affidavit of Lieutenant Michael Romano, the CHPD's chief of detectives in 2006-2009, the period relevant to this case.[1] Romano's affidavit concerns the CHPD's policies concerning how it assigned manpower to investigate crimes and asserts that the CHPD did not give reports classified as "domestic" less priority. (*See* Doc. 190-3.)  Cooper asserts that Romano was never disclosed in the City's Rule 26 disclosures and that his name only came up in depositions of other officers in the context that he was in charge of the CHPD's detectives and that Iacovetti was referred to him on a couple of occasions.  According to Cooper, his testimony on CHPD's gender-neutral policies was withheld until the summary judgment stage.

   As the City points out, Romano's name, title, and involvement in investigations came up in a number of depositions and his name appeared on several narrative detective reports concerning Iacovetti.  The City had no duty to supplement its Rule 26(a) disclosures once Romano was disclosed in those depositions as a supervisor of detectives.  *See* Fed. R. Civ. P. 26(e) (not requiring supplementation when the "additional or corrective information has not otherwise been made known to the other parties during the discovery process. . . .")   Indeed this is a case where, as detailed below, Cooper asserts that the CHPD systematically failed to investigate and follow up on domestic

_____

[1] The City represented to the Court in its summary judgment reply brief that Cooper had dropped its objection to the affidavit from Detective Art Robles.

violence complaints and Cooper seeks to make the City liable for that practice under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). From a practical perspective, in a case where Cooper must demonstrate a CHPD policy or practice, his assertion that he did not know about the person in charge of the detectives who were tasked with following up on Iacovetti's and other women's domestic complaints is not persuasive. Indeed, in one deposition, Cooper's counsel asked a CHPD captain (who later became the chief of detectives) about the CHPD's policy regarding arresting parolees from the captain's days as the chief of detectives. Further, Romano had at least some personal connection, beyond only his position, with the Iacovetti incidents. As Cooper concedes in his motion, CHPD officers referred her to Romano several times. Cooper's motion to strike the Romano affidavit is denied.

As for the audiotapes, in February 2011, Magistrate Judge Gilbert issued a detailed report and recommendation, later adopted by the Court in its entirety, that barred the City from using audiotapes of 911 and dispatch calls that accompanied the police reports generated after the incidents involving Perkins and Iacovetti because they were not produced until well into discovery, when they should have been part of the City's Rule 26 initial disclosures. The City asserts that the order only stated that the City could not present the recordings at trial, and did not mention summary judgment, but the City offers no rationale why such the discovery sanction should not apply at this stage as well. To the extent that the City's facts rely exclusively on the barred recordings, and not also on contemporaneous police reports and deposition testimony, the Court did not consider those facts, and only considered the audio recordings when they were offered by Cooper. Cooper's motion to strike (Doc. 207) is granted in part and denied in part.

3

### B.     Background and Parties

Cooper is the administrator of the Estate of Teresa Iacovetti, who died a week after Perkins

shot her at her Chicago Heights residence on June 26, 2007. (Pl. 56.1 Resp. Bradley ¶ 1; Pl. 56.1

Resp. City ¶¶ 64-65.)[2]   Bradley is a senior parole agent employed by the Illinois Department of

Corrections (IDOC), working under parole supervisors, and was Perkins' parole agent when Perkins

shot Iacovetti. (Pl. 56.1 Resp. Bradley ¶¶ 2, 7.) The City, which operates the CHPD, is a

municipality of about 31,000 people located in the south suburbs of Chicago. (Pl. 56.1 Resp. City

¶ 3.) The City has one of the highest crime rates in Cook County. (Pl. 56.1 Resp. City ¶ 8.) During

the period relevant to this case, the CHPD had about 80 officers and eight detectives to handle

around 44,000 service calls (about 1000 of which were classified as "domestic" in nature according

to the City) and the City reported about 2,000 serious "index" crimes a year. (*Id.* at ¶¶ 5-7, 9.)

### C.     CHPD Policies and Response to Incidents Involving Iacovetti

The CHPD is divided into two divisions, the patrol division, which is responsible for the

department's initial response and for preparing police reports, and the detective division, which

collects evidence, interviews witnesses and seeks felony approval from the prosecutor's office. (Pl.

56.1 Resp. City ¶ 17.) The Illinois Domestic Violence Act and the City's domestic violence protocol

defines "abuse" to include physical abuse and harassment, and activities that would cause a

reasonable person emotional distress, like repeated phone calls and threatening physical force. (City

56.1 Resp. ¶ 3.) CHPD officers are supposed to treat all domestic violence-related crimes the same

---

[2]The Court will refer to the Local Rule 56.1 responses as follows: (1) Cooper's response to the City's 56.1 statement as "Pl. 56.1 Resp. City;" (2) Cooper's response to Bradley's 56.1 statement as "Pl. 56.1 Resp. Bradley;" (3) the City's response to Cooper's statement of additional facts as "City 56.1 Resp."; and (4) Bradley's response to Cooper's statement of additional facts as "Bradley 56.1 Resp."

as all other crimes, and the CHPD's domestic violence protocol requires the police to cross-reference reports of domestic violence with previous reports. (City 56.1 Resp. ¶¶ 5, 7.)

In the late 1990s, Iacovetti had a relationship with Norman DePillars, who was charged by the CHPD with stalking Iacovetti and was later convicted. (Pl. 56.1 Resp. City ¶ 26.) In 2006, Iacovetti called the CHPD to report that her husband at the time, Rufus McCollum, had threatened her and battered her. (Pl. 56.1 Resp. City ¶ 27; City 56.1 Resp. ¶ 10.) The CHPD completed a report detailing that the officers did not arrest McCollum because he was not on the scene. (*Id.*)

Sometime in 2006, Iacovetti began a relationship with Perkins. (Pl. 56.1 Resp. City ¶ 28.) In August 2006, the CHPD arrested Perkins for deceptive practices in connection with Iacovetti's mother, but they never called Bradley to tell him about it. (*Id.* at ¶ 29; City 56.1 Resp. ¶ 33.) Between November 2006 and May 2007, Iacovetti repeatedly complained to the CHPD about harassment from Perkins. (Pl. 56.1 Resp. City ¶ 28.) In one incident, Perkins kicked a chair out from under Iacovetti, but, according to Iacovetti's brother, the CHPD did not advise her about any complaint procedure and did not complete a report about the incident. (City 56.1 Resp. ¶ 11.) In the fall of 2006, a CHPD officer and family friend of the Iacovettis, saw Iacovetti at a bar and told her to stay away from Perkins, that Perkins had scammed Iacovetti's mother, and that Perkins was "not right." (Pl. 56.1 Resp. City ¶ 31.) In the early morning hours of November 26, 2006, both Perkins and Iacovetti called the police; Perkins reported that Iacovetti had broken his windows, and Iacovetti told the police that Perkins had broken into her home using a key he had and stolen various items, including a Rolex watch, other jewelry, and a handgun. (*Id.* at ¶ 32.)[3] When CHPD officers arrived at Iacovetti's house, they found a large amount of marijuana in her house, but she claimed she did

---

[3]A parolee in possession of a handgun is a felony in Illinois. (City 56.1 Resp. ¶ 8.)

not know where the drugs came from. (*Id.* at ¶¶ 32-33.) The CHPD captain on duty that night referred to Iacovetti as a "chick" and that her complaint "sounds like bullshit to me." (*Id.* at ¶¶ 33-34.)[4] The CHPD arrested Iacovetti for the marijuana but the charges were later dropped. (*Id.* at ¶ 34.) A few hours after she was released, Perkins began threatening Iacovetti again, and the CHPD responded a third time that day. (*Id.*)[5] On February 8, 2007, Iacovetti called the CHPD to report more threats from Perkins, but did not want to pursue the matter further. (*Id.* at ¶¶ 36, 38.)[6] Two days later, Perkins called the police to report that Iacovetti threatened him. (*Id.* at ¶ 39.)

The next month, the CHPD responded to a fight between Perkins and Iacovetti's stepfather at a family barbeque; no one was charged in connection with the incident. (Pl. 56.1 Resp. City ¶ 40.) In another incident that month, Iacovetti called the CHPD to report that Perkins was refusing to leave her property, that he had stolen her pepper spray, and that he was screaming at her. (*Id.* at City ¶ 41.) The next month, April 2007, Iacovetti reported that she suspected that Perkins broke her car's

---

[4]At his deposition, the CHPD captain explained that his "bullshit" comment, while "probably inappropriate" was based on Iacovetti's claim that Perkins used a key to get into her house and stole expensive items (though she lived in an impoverished neighborhood), while at the same time claiming that the marijuana was not hers. (Pl. 56.1 Resp. City ¶ 33.)

[5]In his opposition brief, the only incident not involving Iacovetti that forms part of the municipal practice asserted by Cooper is a statement by a CHPD sergeant, Steve Barker. According to Cooper, in one of the recordings, Barker told other officers, that they did not need to arrest "Claude" in connection with another domestic incident if CHPD detectives did not want to speak with him and the other person involved in the incident did not want to sign a complaint. (Pl. 56.1 Resp. City ¶ 34.) To be properly considered on summary judgment, this fact (as well as other evidence offered in Cooper's response to the City's facts) should have been presented as an additional fact under Local Rule 56.1(b)(3)(c) so that the City could respond properly. *See e.g., Woods v. Von Maur, Inc.*, No. 09 C 7800, 2011 WL 3796724, at *4 (N.D. Ill. Aug. 24, 2011) (Kendall, J.); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir.2008) (upholding the district court's refusal to consider the additional facts put forth in response to the movant's statement of facts but not included in the Local Rule 56. 1(b)(3) (C) statement of additional facts). In any event, even taking into account Barker's single statement, taken with Iacovetti's incidents, Cooper has not demonstrated a municipal practice under *Monell*, as described below.

[6]Cooper's citation to Iacovetti's brother's testimony that the CHPD would not write up incidents reported by Iacovetti does not properly dispute Robles' affidavit that states that Iacovetti did not want to pursue the complaint further. (*See* Doc. 190-4.)

6

windshield and that he stole several items from her. (*Id.* at ¶ 42.) In May 2007, Iacovetti called the CHPD and summarized for Sergeant Joseph Petrarca in several conversations the various harassment from Perkins. (*Id.* at ¶¶ 43-44, 47.)[7] Petrarca referred her to Romano and told her to make a complaint for telephone harassment. (*Id.* at ¶¶ 44-45.) The CHPD followed up with Iacovetti, generating a report as well as a domestic violence supplemental report. (*Id.* at ¶ 46.) According to Iacovetti's brother, at unnamed times, Iacovetti complained about Perkins and showed CHPD personnel phone records and text messages showing Perkins' harassment but unnamed CHPD officers said there was little the CHPD could do about the situation. (City 56.1 Resp. City ¶¶ 24-25.)

On May 6, 2007, Iacovetti reported that Perkins damaged her property and the CHPD arrested him. (Pl. 56.1 Resp. City ¶ 51.) As part of the investigation, CHPD officers spoke with Juan Rios, who had been threatened by Perkins. (*Id.* at ¶ 52.) When Iacovetti reported the crime, she asked a CHPD officer "what has to happen? Do I have to die before someone does something?" (*Id.* at ¶ 53.) The officer responded: "I don't know Teresa. I'm just trying to deal with this right now." (*Id.*) When the CHPD was putting Perkins into the lockup, Perkins stated "I know what I have to do when I get out." (*Id.*) The next day, Iacovetti obtained an order of protection against Perkins. (*Id.* at ¶ 56.) Just one day later, on May 8, 2007, Iacovetti reported that Perkins was again threatening her, but Perkins did not answer his door and the CHPD could not find him. (*Id.* at ¶ 57.) Iacovetti asked for a squad car to take her home, but no cars were immediately available due to an arson investigation happening at the same time. (*Id.* at ¶ 58.) At least one CHPD patrol officer cannot recall Iacovetti's

---

[7]In the context of these phone calls, Iacovetti is referred to as Petrarca's "girlfriend" by another officer and as a "bitch" and a "fucking idiot" by Officer Thomas Disney. (Pl. 56.1 Resp. City ¶ 48.)

situation being discussed at the CHPD's morning roll calls in May 2001. (City 56.1 Resp. ¶¶ 19-20.) On June 26, 2007, Perkins shot Iacovetti. (Pl. 56.1 Resp. City ¶ 65.) Iacovetti's brother testified that the next day, a CHPD lieutenant told him, "these things slip through the cracks." (City 56.1 Resp. ¶ 26.)

### D.   Bradley's Duties as a Parole Officer and His Supervision of Perkins

In 2007, Bradley served as the parole agent for Perkins as well as 175 or 180 other parolees. (Pl. 56.1 Resp. Bradley ¶ 29.) As a parole officer, Bradley is responsible for monitoring his parolees through home visits and he has full power to arrest and re-take parolees. (*Id.* at ¶¶ 8-9.) Bradley cannot arrest a parolee without authorization from his supervisor and an arrest warrant issued by IDOC. (*Id.* at ¶¶ 10-11, 15.) If a parolee violates his parole, Bradley prepares a violation report to support a parole "hold," and a supervisor determines whether the parolee has violated the conditions of his parole. (*Id.* at ¶¶ 13, 17.) Once a parolee is arrested, the parole "hold" allows the agency arresting the parolee to hold him without allowing him to receive a bond to leave custody. (*Id.* at ¶ 12.) Parole agents track their contacts regarding parolees in the AMS system, which logs each contact reported by the parole agent. (*Id.* at ¶¶ 26-27.) When Bradley was not in the office and someone called for him, an automated service would take a written message for him, which he could check on his laptop, but he did not have access to voicemail. (*Id.* at ¶ 28.)

When Perkins left prison and started his parole, he signed an agreement outlining his conditions of release, including that he would not break any laws or possess a gun and that he would tell his parole officer if he moved. (*Id.* at ¶ 2.) On August 28, 2006, Perkins called Bradley and admitted he had been arrested by the CHPD on a felony charge for fleecing Iacovetti's mother, an arrest that could support a parole violation; the AMS system reflected that IDOC received

documentation from the CHPD about the arrest. (*Id.* at. ¶¶ 3, 6-7.) Bradley does not dispute that the CHPD and the Village of Steger police department generated a number of police reports about incidents involving Perkins and Iacovetti, some of which listed Perkins' address in Chicago Heights. (*Id.* at ¶¶ 9-18, 21.) However, the CHPD never contacted Bradley or anyone else at IDOC regarding Perkins prior to June 26, 2007, the day he shot Iacovetti. (*Id.* at ¶ 33.)[8]

Two months before she was shot, Iacovetti contacted IDOC and let a message saying that Perkins broke her car window and had ripped her door off her house a month before (which she had reported to the CHPD). (Pl. 56.1 Resp. Bradley ¶ 34.) She also reported that Perkins was not living where he was supposed to be living. (*Id.*) The operator made an entry to request the CHPD police reports to then forward to Bradley when IDOC received them. (Pl. 56.1 Resp. Bradley ¶ 36.) Bradley did not make subsequent requests for the reports, did not visit Iacovetti, and did not speak with his supervisor regarding the call. (*Id.* at ¶¶ 35-37.) Iacovetti called back the next day and left another message, this time giving additional details, including Perkins' unauthorized address in Chicago Heights, that Perkins had stolen from her, that Perkins was violent, armed, and dangerous, and that she was afraid of Perkins. (Pl. 56.1 Resp. Bradley ¶¶ 38-39; Bradley 56.1 Resp. ¶ 15.)[9] Bradley did not follow up to see if Perkins was living at a different address than he reported to IDOC. (Pl. 56.1 Resp. Bradley ¶ 39.) Iacovetti left another message for Bradley on April 16, 2007, and a fourth message on April 21, 2007. (Pl. 56.1 Resp. Bradley ¶¶ 40, 42.) The log for the last call noted that the "Caller is desperate!" (*Id.* at ¶ 42.) Bradley did not return any of Iacovetti's April

---

[8] Though Cooper denied this fact, the evidence cited in his denial does not contradict Bradley's statement.

[9] Learning a parolee has a gun is a basis for a parole agent to file a violation report. (Bradley 56.1 Resp. ¶ 15.)

2007 calls.  (*Id.*)   In response, Bradley "probably" went to see Perkins at an unauthorized address in Park Forest, Illinois.  (*Id.* at ¶ 44.)

In early May 2007, Iacovetti left another message for Bradley telling him that Perkins had been arrested for trying to break into her house.  (*Id.* at ¶ 45.)  A few days later, on May 8, 2007, Perkins called Bradley to report he had been arrested.  (Pl. 56.1 Resp. Bradley ¶ 46.)   Bradley did not check to see if he had received any reports from the CHPD, and Bradley did not speak to Perkins that day.  (*Id.*)  Three days later, Bradley finally spoke to Iacovetti, who told him that she had received an order of protection against Perkins; Bradley requested a copy of the order and put a note in the AMS system requesting that he be directly connected to Perkins if Perkins called in. (Pl. 56.1 Resp. Bradley ¶¶ 47, 49; Bradley 56.1 Resp. ¶ 19.)  The parties dispute whether Iacovetti faxed the order to Bradley; Iacovetti's brother says he saw her fax it, Bradley claims he did not receive anything. (Pl. 56.1 Resp. Bradley ¶¶ 50, 52.)  In any event, Bradley never followed up with Iacovetti to get the order of protection or with the CHPD to get the police reports regarding Perkins.  (*Id.* at ¶¶ 54, 56.)  Though such an arrest would normally spur Bradley to investigate if the parolee had additional arrests, other than the AMS log entry indicating that IDOC would request the police reports, there was no contact between Bradley and the CHPD about Perkins until June 27, 2006, the day after he shot Iacovetti, and Bradley has no recollection of taking any steps to make sure Perkins was complying with his release terms.  (Pl. 56.1 Resp. Bradley ¶¶ 57, 62; Bradley 56.1 Resp. ¶¶ 20, 30.)

The same day Bradley spoke with Iacovetti, May 11, 2007, Perkins called Bradley twice but did not speak with him.  (Bradley 56.1 Resp. ¶ 22.)   On May 23, 2007,  Bradley left Perkins a message and told him to appear at the Chicago Heights parole office two days later.  (*Id.* at ¶ 23.)

The next day, Perkins called Bradley, but could not get through even though Bradley had requested that the AMS system put Perkins through to him immediately. (*Id.* at ¶ 24.) Bradley and Perkins talked the next day, after Perkins cancelled the meeting claiming he forgot his identification at home. (*Id.* at ¶ 24.) On June 8, 2007, Perkins and Bradley met face-to-face and discussed Perkins upcoming June 12 court date, and "probably" discussed Iacovetti's allegations. (*Id.*; Bradley Dep., Doc. 213-3, at 243.)[10] A week after Perkins shot Iacovetti, Bradley completed a parole violation report for Perkins based on the CHPD police report detailing the shooting. (Pl. 56.1 Resp. Bradley ¶ 63.)

### E.     Other Parolees Supervised By Bradley

Bradley supervised a female parolee named "V. Ramirez" beginning in September 2007. (Pl. 56.1 Resp. Bradley ¶ 65.) In July 2008, Ramirez's husband called IDOC to tell Bradley that he no longer wanted Ramirez to live with him; he called back later to tell Bradley that it was a misunderstanding. (*Id.* at ¶ 66.) When the husband called again to say he wanted Ramirez to leave, Bradley conducted a face-to-face meeting with Ramirez and her husband at their home. (*Id.* at ¶ 67.) In November 2008, the husband reported that Ramirez had hit him, and when Ramirez went into custody Bradley completed a parole violation report. (*Id.* at ¶¶ 68-69.) Bradley also supervised a male parolee named "N. Connell." (*Id.* at ¶ 70.) When Connell was arrested for domestic battery on a male victim in November 23, 2009, a local police department (not the CHPD) told Bradley about the arrest and Bradley wrote up a parole violation report soon after. (*Id.*)

---

[10] Bradley testified soon after that he could not remember if he discussed Iacovetti's threats with Perkins at the June 8, 2007 meeting. (Bradley Dep. at 244.) Iacovetti's brother's testimony that Iacovetti, at some unknown date, talked to Bradley and offered him police reports and text messages from Perkins is hearsay. (Bradley 56.1 Resp. ¶ 28.)

## II.     STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court may "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").  Plaintiff, as the party opposing the motion for summary judgment, "get[] the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

## III.     DISCUSSION

Under § 1983, Cooper must demonstrate: (1) a deprivation of a right guaranteed to Iacovetti by the Constitution or laws of the United States; and (2) that a person acting under the color of state

12

law caused the deprivation. *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir.

2009). Because there is some confusion on this point in the parties' summary judgment briefing, it

is important to note at the outset that Cooper sues under 42 U.S.C. § 1983 exclusively for a violation

of Iacovetti's equal protection rights to be free from discrimination based on her *gender*. He does

not assert that Defendants violated Iacovetti substantive due rights by failing to protect her, because

as a general rule, a state is not responsible for protecting citizens from harm by private actors under

the Due Process Clause, and neither the "state created danger" nor the "special relationship"

exception applies here. *See DeShaney v. Winnebago Cty.*, 489 U.S. 189, 195-96, 198 (1989)

("special relationship" exception generally applies when a state has an individual in custody); *see*

*also Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997) ("state created

danger" exception applies when the state affirmatively places an individual in a position of danger

that she would have not otherwise faced); *see also Bowers v. DeVito*, 686 F.2d 616, 618 (7th

Cir.1982) ("there is no constitutional right to be protected by the state against being murdered by

criminals or madmen."); *see also Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (domestic

violence victim has no entitlement under the Due Process Clause to enforcement of an order of

protection). [11]

Nor does Cooper assert that Iacovetti, as a domestic violence victim, was a member of a

suspect class of domestic violence victims entitled to a higher level of protection under the Equal

Protection Clause. Domestic violence victims are not considered to be a suspect class. *See e.g.,*

---

[11] The Court denied Cooper's motion to amend his complaint to add a due process claim because it was untimely. (*See* Doc. 221.) The Court notes that while *DeShaney* and *Castle Rock* foreclose any due process claim by Cooper under the United States Constitution, there is precedent for proceeding with a human rights violation claim in the Organization of American States' Interamerican Commission on Human Rights, as the plaintiff in the *Castle Rock* has done. *See* Caroline Bettinger-Lopez, Jessica Gonzales v. United States: *An Emerging Model for Domestic Violence & Human Rights Advocacy in the United States*, 21 HARV. HUM. RTS. J. 183 (2008)

*McCauley v. City of Chicago*, No. 09 C 2604, 2009 WL 3055312, at *3 (St. Eve., J.) (noting that while domestic violence victims are a "sympathetic" class, there is no controlling authority holding domestic violence victims are a suspect class for the purposes of equal protection); *aff'd on different grounds by McCauley v. City of Chicago*, —F.3d—, 2011 WL 4975644, at * (7th Cir. Oct. 20, 2011) (finding the question of whether domestic violence victims are a protected class under equal protection was a "merits question" depending on the level of scrutiny applied and dismissing the complaint on Rule 8 grounds under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).   In other words, though Iacovetti's status as a domestic violence victim plays into the evidence Cooper presents to support claim for a violation of Iacovetti's equal protection rights, her status is not the classification underpinning her equal protection claim.   Therefore the sole question before the Court is whether a reasonable jury could conclude the Defendants violated Iacovetti's equal protection right not to be discriminated against on account of her gender.

### A.      Equal Protection Standard

The Equal Protection Clause "does not require the government to give everyone identical treatment;" rather, the clause provides for "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (quotation omitted). "When a state actor turns a blind eye to the [Equal Protection C]lause's command, aggrieved parties . . . can seek relief pursuant to 42 U.S.C. § 1983." *Id.*  To show a violation of the Equal Protection Clause, Cooper must show that the Defendants' actions had "a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State*

14

*Police*, 251 F.3d 612, 635-36 (7th Cir. 2001).[12]  To show discriminatory effect, Cooper must show Iacovetti was (1) a member of a protected class, (2) that she was otherwise similarly situated to members of the unprotected class, and (3) that she was treated worse than the members of the unprotected class.  *Id.* at 636.  As for the comparative third prong of the discriminatory effect test, Cooper may either name other individuals that were treated worse or use statistics suggesting such differences. *Id.*

Cooper must then show "intentional or purposeful discrimination."  *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982).  Indeed, "[d]iscriminatory purpose implies more than intent as awareness of consequences."  *Chavez*, 251 F.3d at 645.  "It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group."  *Id.*  (internal citations and quotations omitted.); *see also Nabozny*, 92 F.3d at 453-54 ("[t]he gravaman of equal protection lies not in the fact of deprivation of a right but in the invidious classifications of persons aggrieved by the state's action.").  Negligence by the Defendants is not enough; rather, Cooper must demonstrate the Defendants "acted either intentionally or with deliberate indifference."  *Id.* (citing *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988)); *West v. Waymire*, 114 F.3d 646, 651 (7th Cir. 1997) (negligence is not enough to show violations of equal protection, rather, "the courts insist on a deliberate violation, that is, intentional discrimination.").  Similarly, "isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause." *Shango*, 681 F.2d at 1104.

---

[12]Cooper has not argued the alternative equal protection route, namely that Iacovetti is a "class of one" and that the Defendants intentionally treated her differently than others similarly situated and that there is no rational basis for the different treatment or it was based on a "totally illegitimate animus" against Iacovetti. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (recognizing it is "difficult to succeed" on a class of one claim); *see also Bell v. Duperrault*, 367 F.3d 703, 708 (7th Cir. 2004) (noting that class of one plaintiffs must "eliminate any reasonably conceivable state of facts that could provide a rational basis" for the classification).

### B.    The City's Motion and the Limits of *Monell* Liability

The City is only liable under § 1983 if the alleged equal protection violation "is caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690); *Phelan v. Cook Cty.*, 463 F.3d 773, 789 (7th Cir. 2006) (noting *respondeat superior* is not available against municipalities when their agents violate the plaintiff's constitutional rights).  Like most plaintiffs asserting *Monell* liability, Cooper asserts that the City had a widespread, if informal, policy and practice of violating its own domestic violence protocols and treating domestic violence complaints from women with less seriousness.  (*See* Doc. 215 at 21-23; Pl. 56.1 Resp. City ¶¶ 47, 51, 53, 57; Pl. 56.1 Add'l Facts, Doc. 216, ¶¶ 10, 16, 17.)

The Court must first address, as a threshold, whether a reasonable jury could conclude that the City had a practice of treating domestic violence complaints or complaints from women less seriously than other complaints, and whether it was widespread and well-settled.  Here, as evidence of a widespread practice, Cooper points to the incidents involving Iacovetti as well as the single statement regarding "Claude" made over the radio by Sergeant Barker.  *Phelan* addresses in detail the question of whether a plaintiff may establish a widespread and well-settled practice based on the actions the municipality took against just the plaintiff.  There, the court noted that typically plaintiffs demonstrate a policy by showing that a municipality treated a large number of people in the same fashion.  *Phelan*, 463 F.3d at 789.  However, the plaintiff in that case was the only woman who had her particular job in 12 years and the court found it was impossible for her to show that other women received the same treatment as her.  *Id.*  Consequently, the court did not foreclose a plaintiff from

16

demonstrating a widespread and well-settled practice based solely on her own experience "where she can demonstrate that repeated actions directed at her truly evince the existence of a policy." *Id.*

The court, in the same breath, explicitly laid out that this opening for a plaintiff is a very narrow one. *Id.* at 790. "We are mindful of the Supreme Court's admonition that the word 'policy' generally implies a course of action consciously chosen from among various alternatives," the Court wrote, and plaintiffs need "evidence that there is a true municipal policy at work, not a random event." *Id.* (citing *Estate of Moreland v. Deiter*, 395 F.3d 747, 760 (7th Cir. 2005) and *Palmer v. Marion Cty.*, 327 F.3d 588, 595 (7th Cir. 2003) as examples of cases where a handful of incidents was insufficient to demonstrate a municipal policy.) In sum, the Court noted that the lesson from its previous cases was that

> *'widespread' must be taken seriously.* It is not enough to demonstrate that policymakers could, or even, should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence that the unlawful practice was *so pervasive that acquiescence on the part of policymakers was apparent and amount to a policy decision.*

*Phelan*, 463 F.3d at 790. (emphasis added). Ultimately, the *Phelan* court found that the plaintiff had failed to "weave" the separate incidents into a "cognizable policy." *Id.*; *see also Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (finding a few incidents of damaged cars and erroneously denying that the city had towed a car did not amount to a widespread and well-settled practice when the city towed thousands of cars per year); *Palka v. City of Chicago*, —F.3d—, 2011 WL 4921385, at *6 (7th Cir. Oct. 18, 2011) (finding allegations of discrimination against the plaintiff, another officer, and a smattering of unhelpful statistical evidence to be insufficient to find a policy or practice). Here, even assuming that the CHPD failed to follow the requirements of the

17

Illinois Domestic Violence Act or documented the incidents involving Iacovetti inappropriately, Cooper offers only as evidence of a "pervasive" practice the limited number of incidents involving Iacovetti and Baker's comment about an abuser named "Claude." He offers no statistical evidence. Taking the term widepread seriously, these few incidents are simply insufficient under *Phelan*, *Gable*, *Palmer*, *Dieter*, and *Palka* to demonstrate a policy so widespread, pervasive and well-settled that it amounted to a municipal policy decision.

Cooper cannot rely on the narrow opening from *Phelan* described above. In *Phelan*, the municipal practice asserted by the plaintiff, for unique reasons, only applied to the plaintiff. As Cooper defines it, the practice asserted here affected many more women than just Iacovetti. In other words, unlike the plaintiff in *Phelan*, Cooper cannot argue the practice only applied to Iacovetti, because Iacovetti was not the only domestic violence victim in Chicago Heights. Rather, this what *Phelan* called the "typical" case, where the plaintiff must show a widespread practice by referencing more than just what happened to the plaintiff. *Phelan*, 463 F.3d at 790. Because Cooper cannot demonstrate a widespread and well-settled practice that the CHPD treated domestic violence complaints less seriously than other complaints, the actions of the City's agents cannot be considered to be a municipal decision under *Monell* and the City is entitled to summary judgment.

### C.     Bradley's Motion

Setting aside whether Cooper has identified similarly situated males who Bradley treated better than Iacovetti, Bradley is entitled to summary judgment because Cooper cannot demonstrate that Bradley deliberately discriminated against Iacovetti. Indeed, Cooper presented no evidence that Bradley made any decision to act or not with respect to Perkins' parole because Iacovetti is a woman, or even because she was a domestic violence victim.

18

Cooper asserts that Bradley did not write up Perkins for a number of obvious and known parole violations and deviation from established practices is evidence of discriminatory intent. *See Nabonzny*, 92 F.3d at 455 (noting that "departures from established practices *may* evince discriminatory intent" and citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also *might* afford evidence that improper purposes are playing a role.") (emphasis added). In *Nabonzy*, a gay high school student brought a gender-based equal protection claim because school officials sat idly by when he was harassed and battered by other male students. 92 F.3d at 449. The court noted a departure from established discipline practices for the student's tormentors, in combination with additional evidence that the individual defendants literally laughed at the plaintiff's pleas for help and the defendants' concession that it aggressively punished male-on-female battery, defeated summary judgment. *Id.* at 455.

Here, even assuming that Bradley diverted from established practice of when a parole officer should initiate revocation proceedings (common sense and expert testimony provided by Cooper suggest he did), *Nabonzy* does not stand for the proposition that departure from an established practice, by itself, establishes sufficiently discriminatory intent to defeat summary judgment. Indeed, the Seventh Circuit in *Nabonzy* and the Supreme Court in *Arlington Heights* considered such a departure from established practice as a *type* of evidence that could show discriminatory intent, not *sufficient* evidence of discriminatory intent. If departure from an established practice by itself were sufficient to demonstrate discriminatory intent, the key prong of the equal protection test would impermissibly devolve from the current inquiry—whether the official intended to cause adverse effects to a member of the suspect class—to the question of whether the official met the duty of care;

19

in other words, whether the official was negligent. *See Nabonzy*, 92 F.3d at 454 ("[a] showing that the defendants were negligent will not suffice" because equal protection jurisprudence requires that an official make a decision to act (or not act) "at least in part for the purpose of causing its adverse effects on the identifiable group.") Bradley is entitled to summary judgment on Cooper's equal protection claim.[13]

## IV.   CONCLUSION

Though Cooper has not demonstrated that the Defendants' inaction was a violation of Iacovetti's equal protection rights, her death should certainly spark serious reflection by the CHPD and IDOC's highest-ranking officials about how to prevent such instances in the future. Indeed, Bradley's briefing admits "a terrible mistake and deficiency" in responding to Iacovetti's complaints. (Doc. 227 at 13.) However, holding governmental entities responsible for such negligence or poor police work is not permitted by the law and would subject the taxpayer to near limitless liability. For the above reasons, the Court grants the City's and Bradley's motions for summary judgment (Docs. 188 and 192) and enters final judgment in their favor.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: October 27, 2011

---

[13] The Court also grants summary judgment to the unnamed Doe 1 defendant, per Cooper's consent. (*See* Doc. 215 at 23.) The Village of Steger and its Doe officer were previously dismissed with prejudice. (Doc. 118.)